**Lisa Ann BURNS, Plaintiff,**

v.

**McGREGOR ELECTRONIC
INDUSTRIES, INC.,
Defendant.**

**Civ. No. C85–1038.**

United States District Court,
N.D. Iowa, E.D.

April 7, 1992.

William G. Blum, Dubuque, IA, for plaintiff.

Gary L. Robinson and Kemberly A. Teneick, Klinger, Robinson & McCuskey, Cedar Rapids, IA, for defendant.

## ORDER

STUART, Senior District Judge.

The above entitled action is before this Court after reversal and remand by the Eighth Circuit Court of Appeals. 955 F.2d 559. The parties agreed the matter should be re-submitted to the court on written briefs, which have now been filed.

## I.

The final paragraph of the circuit opinion filed January 30, 1992 states:

Our disposition of this case should not be read as constituting a *de facto* entry of judgment for Burns. *Cf. LeGrand v. Trustees of Univ. of Ark.*, 821 F.2d 478 (8th Cir.1987), *cert. denied*, 485 U.S. 1034 [108 S.Ct. 1592, 99 L.Ed.2d 907] (1988). That is not our intention, for we would not presume to substitute our view of the evidence for that of the experienced trial judge, who had the benefit of observing the demeanor of at least some of the witnesses whose testimony was received at trial. Rather, we ask the district court to review the evidence in the light of the considerations we have expressed above. What outcome will flow from those additional findings is for the district court to determine in the first instance.

I have had considerable difficulty in deciding the approach the circuit court wants me to take in reviewing the evidence. Some of the language in the opinion reads as if the circuit court took a different view of the evidence than I had and reached different factual conclusions. Other portions of the opinion interpret my findings and reasoning differently than I intended. I obviously did not express myself very well. But, with the court's assurance that it did not intend to substitute its view of the evidence for mine, I have reviewed the entire record, including the transcripts, depositions and exhibits. I will address each of the considerations the circuit court has set forth in its opinion. Because of frequent references to my Ruling and Order filed July 31, 1990 and for the sake of brevity I will incorporate it herein by this reference as an appendix.

### A.

Under the totality of the circumstances, the district court should not carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode. Instead the trier of fact must keep in mind that "each successive episode has its predecessors, that the impact may accumulate, and that the work environment created may exceed the sum of the individual episodes."

Circuit opinion 955 F.2d at 564.

I attempted to approach the evidence in that manner in the first ruling. In reaching the following ultimate facts, I have considered all three periods of employment.

McGregor was a miserable place to work. Very few people would want to work in that atmosphere except as a last resort and would move to a different job at the earliest opportunity. During her first two periods of employment, plaintiff was sexually harassed by Marla Ludvik and Oslac. Part of their conduct was brought about by her nude pictures. There were rumors that a petition to get her fired was circulated, but the evidence was not sufficient to establish this as a fact. These rumors are an example of the rampant gossip.

During her third period of employment the sexual harassment by co-employees had abated considerably. Oslac was seldom in the plant and had not been in the building

four to six weeks before plaintiff quit. Plaintiff claims that she returned to work the third time on the assurance that Oslac would no longer enter the plant. Although he did walk through the production area a few times, he did not spend much time in the plant. The plant manager substantially fulfilled her assurance. Plaintiff greatly exaggerated the contacts she had with Oslac during that period of employment. With the exception of ongoing disputes with male employees over job description, working conditions were better. Plaintiff was no longer a special target of sexual harassment by the employees or Oslac.

As stated in the first ruling and order the general working conditions, past sexual harassment by the employees, Oslac's unwelcome sexual advances and the running disputes over job descriptions all contributed to her decision to quit her job. But, I remain convinced that she would not have quit her job for these reasons. She quit the job because of the incident on the last day when she and Eugene Ottaway got into a violent name calling confrontation.

In my opinion the sexual harassment by the employees and the unwelcome sexual advances by Oslac peaked during the second period of employment. The third period of employment was less unpleasant.

### B.

The threshold for determining that conduct is unwelcome is "that the employee did not solicit or incite it, and the employee regarded the conduct as undesirable or offensive." *Hall* [*v. Gus Construction Company*] 842 F.2d [1010] at 1014 [ (8th Cir.1988) ]. The district court's finding that Oslac's advances were unwelcome necessarily required the district court to believe Burns' testimony that Oslac's behavior was offensive to her. Thus, the district court's finding that Oslac made unwelcome advances toward Burns and its finding that Burns was not credible when she stated that Oslac's behavior was offensive appear on their face to be internally inconsistent. Circuit opinion, 955 F.2d at 565.

■ Obviously I did not believe these two findings were inconsistent or I would

have not made them. Nor do I feel that I necessarily had to believe Burns' testimony that Oslac's behavior was offensive to her before I could find his advances were unwelcome.

In *Hall v. Gus Construction Co.*, 842 F.2d 1010 (8th Cir.1988), cited by the circuit court, that court quoted from *Moylan v. Maries County*, 792 F.2d 746, 749 (8th Cir. 1986), as follows:

In order to constitute harassment, the conduct must be "unwelcome" in the sense that the employee did not solicit or invite it, and the employee regarded the conduct as undesirable or offensive.

*Hall*, 842 F.2d at 1014.

Because of the sentence structure, I interpreted this quotation as setting forth two elements required to establish a cause of action for sexual harassment (1) that the conduct was unwelcome because it was not solicited or invited, and (2) that the kind of conduct engaged in was offensive to plaintiff. I found the conduct was unwelcome because it was not solicited or invited. I found that the conduct in and of itself was not offensive to her because of her character as revealed by the record. I consider this element similar to the "affected individual" element discussed in I(F).

Oslac's sexual advances toward plaintiff were unwelcome because they came from Oslac. She would not have been offended if someone she was attracted to did or said the same thing. If offensiveness is to be determined by plaintiff's reaction to the *particular* conduct of a *particular* person, then a finding that the sexual advances were unwelcome would also determine that they were offensive. On the other hand, if plaintiff's reaction to the person whose conduct was not welcome is viewed separately from plaintiff's reaction to the same conduct by someone else, the two findings are consistent. I considered them as separate issues. If the answer to the first question also answers the second question, why ask it? I determined from the record in the case including plaintiff's personal history (which need not be set out here), her man-

ner of dress, her pierced, bejeweled nipples, the location of her tattoo, her interest in having her nude pictures appear in a magazine containing much lewd and crude sexually explicit material and her appearance on the stand that the type of conduct in which Oslac engaged was not in and of itself offensive to her.

## C.

The district court reasoned that a person who would appear nude in a national magazine could not be offended by the behavior which took place at the McGregor plant. It also believed that Burns had exaggerated the severity and pervasiveness of the harassment and its effect on her. Again, these findings are at odds with the district court's finding that Oslac's advances were unwelcome.

Circuit opinion, 955 F.2d at 566.

My reasoning was not based on the fact that she appeared nude in a national magazine. The statement in my ruling and order upon which the first sentence quoted relies is as follows:

In view of plaintiff's willingness to display her nude body to the public in Easy Rider publications, crude magazines at best, her testimony that she was offended by sexually directed comments and or Penthouse and Playboy pictures is not credible.

My statement was directed toward her credibility on that particular issue and was based, not on the plaintiffs nude pictures, which were not obscene, but upon the content of the magazines, which was. I did not believe her testimony that she was unaware of the content of the magazines. Neither did I believe that she was offended by the content of the Easy Rider magazines. In view of this, "her testimony that she was offended by sexually directed comments and/or Penthouse and Playboy pictures is not credible."

I continue to believe and find that plaintiff "exaggerated the severity and pervasiveness of the harassment and its effect on her." That finding does not conflict with my finding that Oslac's advances were unwelcome but not offensive to plaintiff, as I tried to explain in division I(B).

## D.

We believe that a reasonable person would consider the conduct of Oslac and Burns' supervisors to be sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment.

After having reviewed all of the considerations expressed by the circuit court, the court finds that a reasonable person would consider the conduct of Oslac and his supervisors sufficiently severe and pervasive to alter the conditions of employment and create an abusive work environment. As I have stated before, the general working conditions for all employees was bad. Mary Ellen White stated it best. "It's probably a last resort of anybody that needs a job. If they need a job bad enough that they need money. They're always hiring, because they can't keep their help. Like I say, I worked there five times, and if I got to the point where I absolutely had to have a job, I'd probably go back. If I could find another job, I would be gone again." Plaintiff was a particular target, the first two periods of employment, in part because of her own actions. The gossip was rampant but never established as being factually true.

I now hold that the plaintiff has established that a reasonable person would consider the sexual harassment at McGregor to be "sufficiently severe and pervasive to alter the conditions of that person's employment and create an abusive working environment."

## E.

The question is whether Burns has shown she is an "affected individual," that is, whether she was at least as affected as the reasonable person under like circumstances. On remand, the district court must determine whether Burns was as affected as that hypothetical "reasonable person."

Based on the entire record, I find that the plaintiff was not as affected as the hypothetical reasonable person would have been. In addition to the factors mentioned under divisions I(A) and (B), she had little support from other employees, except her mother, as to the extent of problems with Oslac. I find most of her mother's testimony not credible.

### F.

Burns continually complained to different supervisors, and she quit three separate times when she could no longer tolerate the conduct.

I have had difficulty interpreting this statement as anything other than a finding of fact contrary to findings I made. I found that she quit as a result of a work dispute with Eugene Ottaway. However, as the circuit court has indicated I should make the findings of fact in the first instance, I will do so. I believe she exaggerated her concern about the harassment, the number of her complaints and the effect of the harassing atmosphere on her wellbeing. Oslac had, at most, few contacts with her during the third period of employment and his sexual advances had stopped. Her testimony of continued frequent contacts is not supported by the testimony of the other witnesses. I continue to believe that the reason she quit was the incident that came about because of the work dispute with Ottaway and the general bad working conditions all employees endured, rather than sexual harassment.

### G.

Burns clearly alleged a continuing course of harassment that caused constructive discharge on all three of the occasions she quit work.

Circuit opinion, 955 F.2d at 563.

This sentence appears in Division II of the circuit opinion in which the court held that it was proper to consider the evidence of harassment during all three periods of employment. As plaintiff is making no claim for back pay between periods of employment, I do not interpret this statement

to require me to determine if constructive discharge took place on the first two periods of employment. Her strongest claim could have been made when she quit the second time, but the statute of limitations had run before this action was filed.

In summary, I find "that a reasonable person would consider the conduct of Oslac and Burn's supervisors to be sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." Circuit opinion, 955 F.2d at 566. I also find that Burns has not "shown she is an 'affected individual'" because she has not shown that she was "at least as affected as the reasonable person under like circumstances."

### II.

■ This case for back pay was brought under the general doctrine of constructive discharge. A finding of constructive discharge under Title VII sex discrimination cases exists if working conditions are so difficult or unpleasant that a reasonable woman in the employee's shoes would feel compelled to resign. *Yates v. Avco Corp.*, 819 F.2d 630, 636–37 (6th Cir.1987). In addition to proving a hostile working environment claim, plaintiff must establish a causal connection between that claim and her resignation. *See Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 905 (11th Cir.1988); Marlisa Vinciguerra, Note, *The Aftermath of Meritor: A Search For Standards in the Law of Sexual Harassment*, 98 Yale L.J. 1717, 1724 (1989).

Even if plaintiff has established a hostile working environment and was as affected as the hypothetical reasonable person, she has, in the court's opinion failed to establish the required causal connection between the hostile working environment and her resignation.

I repeat the following fact findings from my previous ruling and order, p. 6 [appendix p. 513]:

The general working conditions; gossip about plaintiff's working attire and the nude pictures in a crude and lewd publication and her resulting treatment by co-employees; unwanted sexual ad-

vances by Oslac—the 65 year old owner of the plant; and the running dispute with other employees about whose duty it was to move and stack speakers for the laboratory workers all contributed to plaintiff's decision to quit her job. But the primary reason she left work and did not return was the incident on the last day during which she and Eugene Ottaway got into a violent name calling argument and speakers were knocked about.

In my opinion, but for the episode referred to above, plaintiff would have continued to work at McGregor until she, like the other employees, could have found a job elsewhere.

I hold no brief for Oslac or McGregor Electronic. Working conditions there were deplorable. Conduct that could amount to sexual harassment was common place. On the other hand, plaintiff had the burden of proving constructive discharge based on sexual harassment. In my opinion she failed to meet that burden.

### III.

I have held that plaintiff has established that a reasonable person would consider the atmosphere at McGregor Electric and Oslac's conduct sufficiently severe and pervasive to create a hostile working environment. It does not seem just or fair that it should escape any liability for the conditions existing in its workplace.

■ Hostile environment claims are limited to equitable relief because there is no need to establish economic loss. *Bohen v. City of East Chicago*, 799 F.2d 1180, 1184 (7th Cir.1986). *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64 and 65, 106 S.Ct. 2399, 2404 and 2405, 91 L.Ed.2d 49 (1986) Note, 98 Yale L.J. at 1719 & 1723.

In *Huddleston*, after holding the trial court's ruling that plaintiff failed to prove discrimination caused her constructive discharge was not clearly erroneous, the Eleventh Circuit disagreed with the trial court's determination that plaintiff was not entitled to any relief under Title VII, saying that a prima facie case of sexual harassment may entitle her to recover nominal

damages and to make her eligible for attorneys fees. *Huddleston*, 845 F.2d at 905.

Although plaintiff's complaint requests equitable relief, including attorneys fees, the case has been treated throughout as a constructive discharge case, not a case for equitable relief. I will not take it upon myself to inject these issues into the case when they have not been heretofore involved.

IT IS THEREFORE ORDERED that the clerk shall enter judgment in favor of the defendant and against the plaintiff with costs taxed to the plaintiff.

### APPENDIX

In the United States District Court

Northern District of Iowa

Eastern Division

Lisa Ann Burns, Plaintiff,

vs.

McGregor Electronic Industries, Inc., Defendant.

Civil No. C85–1038

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER GRANTING JUDGMENT FOR THE DEFENDANT AND AGAINST PLAINTIFF.

This is a sex discrimination case brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Plaintiff claims that she was subjected to sexual harassment in the workplace creating such a hostile working environment that the quitting of her job constituted a constructive discharge. This action was tried to the court on June 18, 19, 1990.

In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986), the Supreme Court held "that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." Not all workplace conduct that may be described as harassment affects a "term, condition, or privilege" of employment within the meaning of Title VII. *Id.* at 67, 106 S.Ct. at

2405. For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive working environment. *Id.* The trier of fact must determine the existence of sexual harassment in light of the record as a whole and the totality of the circumstances such as the nature of the sexual advances and the context in which the alleged incidents occurred. *Id.* at 69, 106 S.Ct. at 2406. *See also Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1013 (8th Cir.1988).

The plaintiff, Lisa Burns, quit school in the middle of the 9th grade because she didn't get along with other students. She felt that they picked on her because she was poor. She testified that she felt sexually harassed. At age 18½, plaintiff got her first regular job at McGregor Electronic Industries, Inc. (McGregor Electronics). She worked there from October 14, 1980 to August 10, 1981. Plaintiff testified that during this period of time she got along well with most of the employees, but that Marla Ludvik, a co-worker, made derogatory comments about her, tried to get her to date male employees, and accused her of seeing Paul Oslac, the owner of McGregor Electronics. Ludvik denied any such conduct. Plaintiff testified that she complained to supervisors but that nothing changed.

Plaintiff also testified that after she began working on the main floor of the factory, Oslac talked to her about sex, showed her pictures from Penthouse magazine, tried to get her to go out with him, and invited her to his apartment on the top floor of the factory to watch pornographic movies. She said that she did not say "no" outright because she was afraid of losing her job. Rather, she would decline his advances with one reason or another and try to change the subject. She testified further that Oslac directed lewd gestures at her once while she was working. During the first period of employment Oslac was at the factory approximately two days each week. Plaintiff testified that she eventually became emotionally upset and

quit because it was affecting her work. There were, however, no complaints about the quality of her work, and Oslac denied any such conduct. Plaintiff claims she did not file for unemployment compensation because she did not know she could apply.

Plaintiff was rehired by Virginia Kelley about five weeks later and worked from September 15, 1981 to June 20, 1983 as a tester at better pay. Virginia Kelley managed the plant from August 19, 1981 to February 28, 1982. Plaintiff's mother, Marlene Bouska, had been working at McGregor Electronics since October 14, 1980. Plaintiff and her mother testified that Kelley asked Marlene to ask plaintiff to come back to work. Kelley, on the other hand, testified that Marlene asked her to rehire plaintiff.

As a tester, plaintiff tested speakers manufactured at the plant as they passed through her testing booth on the assembly line. The testing booth was open on the top, on the front below the assembly line, and on the sides at the points of entry and exit of the assembly line. A door at the back of the booth ordinarily was open. Plaintiff testified that while she was working, Oslac would come into the booth alone and proposition her. She testified that Oslac spent "almost all" of the time that he was at the plant in her testing booth and that on at least two occasions he improperly touched her. Oslac testified to the contrary. During this second period of employment Oslac was at the plant from about Monday noon to Tuesday mid-morning each week.

In the spring of 1982, plaintiff appeared nude in Easy Riders "In the Wind" magazine. In April 1983, she appeared nude in Easy Riders magazine. The magazines circulated throughout the plant, and many employees saw them. In these photographs she had ornaments or earrings attached to her nipples. One picture revealed a tatoo in the pelvic region. Her father had pierced her nipples and taken the photographs in her brother's presence.

Plaintiff testified that she once agreed to have dinner with Oslac because she feared losing her job. She accepted on the condi-

tion that her mother could come too. Her mother refused to go with her, but her father went with her instead. Plaintiff testified that as they were leaving after the meal, her father told Oslac to "leave the girls alone," and that Oslac nodded in agreement. Oslac testified that he invited plaintiff and her father to dinner in order to persuade her not to quit working at the plant. The Court finds that Oslac was surprised when the father appeared instead of the mother.

Plaintiff testified that some of her co-workers harassed her. In particular, she testified that Marla Ludvik circulated a petition to get her fired because of the nude pictures. Only one witness testified that she saw the petition. The rest had heard that a petition was being circulated but did not see it. No one signed the petition. Two other male co-workers subjected her to offensive name-calling. Plaintiff testified that she quit because of the harassment. She said that her work slowed. However, no one complained about the quality of her work.

Plaintiff was rehired and worked from September 26, 1983 to July 19, 1984. By this time, Virginia Kelley was managing the plant again. Plaintiff testified that Virginia Kelley persuaded her to return to work by promising that Oslac would leave her alone. Kelley denied this. During the third period of employment, plaintiff started as a tester and was then transferred to the laboratory. Plaintiff testified that she again was subjected to advances from Oslac and harassment from co-workers.

On July 19, 1984, plaintiff walked off the job following a work dispute with Eugene Ottaway. Ottaway had moved a stack of speakers to the plaintiff's work area. Plaintiff asked Ottaway to move them into her workroom and then asked him to lower the stack and not to stack them so high in the future. Plaintiff testified that Ottaway began throwing down the stack of speakers. Ottaway admitted cursing and subjecting her to offensive name-calling. He testified plaintiff also called him names. He testified that the speakers simply fell down after he moved the stack into plaintiff's workroom. Plaintiff testified she got upset, left, and that weekend decided to quit her job.

Plaintiff did not see Oslac in the plant during the last four to six weeks of her employment with McGregor Electronics. During plaintiff's last period of employment, Oslac arrived at the plant Monday about noon and left before noon on Tuesday each week. Oslac occasionally would pass through the work area briefly on his way to or from the plant's office.

Plaintiff filed an unemployment compensation claim. McGregor Electronics did not contest the claim before the hearing officer. Plaintiff received unemployment compensation benefits after leaving McGregor Electronics. Plaintiff obtained employment in 1987 with another employer.

The Court has had some difficulty in determining what actually went on at McGregor Electronics. Rumor and gossip ran rampant. As one witness testified:

It's probably a last resort of anybody that needs a job. If they need a job bad enough that they need money. They're always hiring, because they can't keep their help. Like I say, I worked there five times, and if I got to the point where I absolutely had to have a job, I'd probably go back. If I could find another job, I would be gone again.

The general working conditions; gossip about plaintiff's working attire and the nude pictures in a crude and lewd publication and her resulting treatment by co-employees; unwanted sexual advances by Oslac—the 65 year old owner of the plant; and the running dispute with other employees about whose duty it was to move and stack speakers for the laboratory workers all contributed to plaintiff's decision to quit her job. But the primary reason she left work and did not return was the incident on the last day during which she and Eugene Ottaway got into a violent name calling argument and speakers were knocked about.

The sexual advances of Oslac toward plaintiff peaked during the second period of employment. During the third period of

employment Oslac was seldom in the production portion of the plant. There was little or no sexual harassment during this period. Plaintiff had not even seen Oslac for four to six weeks prior to the time she quit. Oslac's conduct toward plaintiff, at most, played a minor role in her decision to quit.

Similarly, the sexual harassment that plaintiff received from her co-workers peaked during the second period of employment. The harassment resulted from the publication of the nude pictures. During the third period of employment there was little or no sexual harassment directed toward plaintiff by her co-workers. By that time, the pictures had come to rest in someone's desk drawer, and the general working conditions prevailed again.

Oslac's conduct toward plaintiff and the sexually related conduct of others did not interfere with her job performance and did not result in any tangible economic loss. His conduct and the conduct of others did not seriously affect plaintiff's psychological well-being. In view of plaintiff's willingness to display her nude body to the public in Easy Riders publications, crude magazines at best, her testimony that she was offended by sexually directed comments and Penthouse or Playboy pictures is not credible.

## CONCLUSIONS OF LAW

A. The Court has jurisdiction of this action.

B. To prevail on a sexual harassment claim, the plaintiff must show that (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take proper remedial action. *Staton v. Maries County,* 868 F.2d 996, 998 (8th Cir. 1989).

C. In order to satisfy the fourth element, the plaintiff must show that the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986); *Minteer v. Auger,* 844 F.2d 569, 570 (8th Cir.1988). Not all unwelcome harassment directed at the plaintiff provides grounds for recovery in a Title VII action. *See id.*

In light of the record as a whole and the totality of the circumstances, the court holds that the Plaintiff has failed to satisfy the fourth element. The Court has no doubt that Oslac made unwelcome sexual advances toward plaintiff during her first two employment periods. There were few opportunities for him to see her the third period, however. And although plaintiff was subjected to some sexual harassment from her co-workers, it was the result of the publication of the nude pictures and it subsided after the second period of employment. In the opinion of the court, plaintiff exaggerated the severity and pervasiveness of the alleged sexual harassment and its effect upon her. The sexual harassment was not sufficiently severe or pervasive to establish a violation of Title VII. She quit as a result of the work dispute with Ottaway—a dispute unrelated to any sexual harassment. Plaintiff has failed to establish by a preponderance of credible evidence her claim that sexual harassment created such a hostile and abusive work environment that her quitting of the job constituted a constructive discharge.

## ORDER

IT IS ORDERED that the clerk shall enter judgment in favor of defendant and against plaintiff with costs taxed to the plaintiff.

Signed this 31st day of July, 1990.